# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

DARREN P. TOLLIVER,

    Plaintiff,

v.

MARINE CREDIT UNION,

    Defendant.

Case No.: _____

Jury Trial Demanded

## COMPLAINT

NOW COME Plaintiff Darren P. Tolliver, by his attorneys, Cade Law Group LLC, and for his Complaint against Marine Credit Union ("Defendant" or "Marine Credit"), and alleges:

## INTRODUCTION

1. This is an action under Title VII of the Civil Rights Act of 1964 as amended, and Title I of the Civil Rights Act of 1991 ("Title VII") to correct unlawful employment practices on the basis of race by Defendant and to provide appropriate relief to a former employee. As alleged with greater particularity below, defendant has engaged in unlawful discrimination by terminating Tolliver on the basis of his race and ending his employment at Marine Credit on the basis of his race.

2. This also is civil action under 42 U.S.C. § 1981.

3. Finally, this is an action under Wisconsin state law, including for violations of Wisconsin's Fair Employment laws, Wis. Stat. §§ 111.31 *et seq.*

## JURISDICTION

4. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-5(f) (1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981 and 1981a.

5. Tolliver has complied with all jurisdictional prerequisites to action under Title VII of the Civil Rights Act of 1964 by timely filing a charge of discrimination with the Wisconsin Equal Rights Division on July 13, 2018.

6. The EEOC provided Tolliver a Notice of a Right to Sue letter dated March 1, 2019. Attached hereto and incorporated herein as **Exhibit A** is a true and correct copy of Tolliver's Right to Sue letter that he received from the EEOC.

7. This Court also has supplemental jurisdiction over all other claims under 28 U.S.C. §1367 because they form part of the same case or controversy as the aforementioned claims.

8. Venue in this judicial district is proper by virtue of 28 U.S.C. §1391 in that many of the alleged acts were committed in the Eastern District of Wisconsin. Tolliver worked for Defendant in the Eastern District of Wisconsin. Additionally, the Defendant does business in the Eastern District of Wisconsin.

## PARTIES

9. Tolliver is an adult male of African-American descent residing at 117 E. Garfield Avenue, Waukesha, Wisconsin 53189.

10. Defendant Marine Credit, at all material times, is a Wisconsin financial

institution located in the State of Wisconsin with a principal place of business at 811 Monitor Street, La Crosse, Wisconsin 54603.

## **FACTS**

11. Tolliver was terminated on November 10, 2017.

12. At the time of his termination, Tolliver was employed as a vice-president and manager.

13. Tolliver's termination were a pretext for Tolliver complaining about his treatment compared to his peers.

14. During the week of September 25, 2017, Tolliver was asked to spend the week in La Crosse, Wisconsin to call on delinquent accounts. Tolliver was not employed by Marine Credit in La Crosse but asked to travel there to assist with the Bank's collections issue in that area. Because of the loan delinquency problems, the Bank had experienced, many branch managers were visiting La Crosse to make phone calls for a week to attempt to collect on delinquent accounts.

15. As of the date of his recent termination, Tolliver was the only district manager required to do this menial task. In an email when he asked his supervisor the purpose of going to La Crosse during this time, the supervisor indicated the purpose would be training and education program. When Tolliver talked to him a few days before Tolliver was to attend this supposed training and education program, he then told Tolliver that he instead would be calling on delinquent accounts just as other branch managers have done before.

16. It was very demoralizing to Tolliver for him to be the only district manager to be treated differently in this matter. Not only was this embarrassing as no one at his

level has had to do this, it also caused Tolliver's team to be at a disadvantage. During this same week, two new lenders started their careers at the branch that week and Tolliver was not able to properly train and onboard them because Tolliver was busy calling delinquent accounts against his will in La Crosse.

17. In March of 2017, Tolliver was told that his lending authority as a district manager was to be suspended. Tolliver was not given a single, specific reason in writing or an example as to why this was happening. Tolliver was told very general comments that Shawn Hanson, the president of Marine Credit, did not like the lending decisions Tolliver had made without giving him any specific examples of what Tolliver was doing wrong.

18. Subsequently, in June of 2017, Tolliver had his consumer lending authority reinstated and was told that he would have his mortgage lending authority reinstated in August of 2017.

19. In August 2017, Troy Moen, Vice President of Operations, did a thorough review into Tolliver's recent lending decisions. He found that all 16 consumer loans that Tolliver approved were deemed a good loan decision. Yet Tolliver's mortgage lending authority was not reinstated as promised.

20. Prior to his termination, Tolliver spoke with his former manager, Mark Barker, to inquire about the lending decisions that Tolliver was making. At that time, it was well past the stated August 2017 target for Marine Credit to reinstate Tolliver's mortgage lending authority.

21. From late March 2017, when his mortgage lending was suspended, until the time of his termination, Tolliver was instructed to send all mortgage loans to Mark

Barker for approval if he supported the issuance of the loan. During this time, there was not one single loan that Tolliver recommended for approval that Mark Barker said was a bad loan. The comments Mark Barker may have had regarding the loan had nothing to do with the loan being a quality loan decision, but rather, were application tweaks due to a clerical error from the mortgage representative who took the application, or if Barker wanted more clarity on a topic.

22. Mark Barker said Tolliver's lending decisions were good but because of the delinquency issues in the Milwaukee Area (including a different district in Milwaukee that had much worse numbers in terms of delinquency and was hurting Barker's district), Barker could not advocate for Tolliver to get his mortgage lending authority back at that time.

23. During this same meeting Tolliver was given a written warning that stated that Tolliver was tardy on performing some electronic classes, in delivering a monthly performance review to his direct reports and in giving his monthly performance review comments to his manager on time. Tolliver was treated very differently and was reprimanded because of these tardiness issues when others were not. Marine Credit Union had a culture of not taking the monthly performance reviews seriously. At the time of this subsequent meeting, Tolliver was with the company for a full year and had never had an in-person monthly performance review given to me. Most commonly, his manager prior to Mark Barker (Tim Cruciani who left in February of 2017) would email me the same day the monthly performance review was due and said call him if Tolliver had any questions. There was not a culture of using that tool for managers to truly develop employees.

24. Tolliver also treated differently compared to his peers. In May 2016, a direct manager who was managing the 27th Street location in which Tolliver was working was relocated, which effectively evolved Tolliver's position into both Branch Manager and District Manager. However, Tolliver did not receive increased compensation or training for this additional role. When Tolliver began falling behind on work-related items, he started composing a "time audit" so he could show his manager (Mark Barker) how Tolliver was struggling to keep up trying to perform two very different roles that both are full time (District Manager and Branch Manager).

25. When Tolliver reached out multiple times for help, Tolliver was told statements like, "I can't hold your hand" or that Tolliver was "making excuses," and how other district managers were in a similar situation performing better than Tolliver was. This is an untrue statement as the only other district manager who was short-staffed branch managers was an individual who was employed by Marine Credit for 10 years and had his own office in Fond Du Lac where he never had to worry about members walking in and interrupting him. He did not have to take member payments or do many tasks that Tolliver was doing on a regular basis. For many weeks Tolliver ran a branch with just himself and one other lender for a branch that had significant member walk in for transactions and other member service issues that prevented Tolliver from doing his job successfully.

26. Tollliver also was treated differently due to certain quality and service scores. At Marine Credit, quality and service scores are part of the monthly performance review that Marine Credit Union managers are supposed to deliver to the direct reports monthly. The quality score is relatively objective and takes into account quantitative

6

factors such as loan errors or deposit errors made in one's district in that particular month. The service score, however, is very subjective. The only quantifiable item that is related for service score is "president inbox complaints," which occurs when someone goes to the Marine Credit website and makes a complaint that rises up to the president's office. In Tolliver's 18 months of service at Marine Credit, he received only one president inbox complaint that was not directed directly at a staff member in his district but more of the frustrating process of changing the due date on a loan after it already was set. Despite only one such complaint, for the last six months prior to his termination, Tolliver received less than satisfactory marks on his personal score card in the quality and service areas. Tolliver is aware of other district managers who are not African-American who have had multiple president inbox complaints and their quality and service scores were not impacted during this time as Tolliver's was impacted.

27. None of the above-referenced incidents or situations happened to his white counterparts with the exception of calling on delinquent accounts.

28. Not only was Tolliver treated poorly compared to his peers, Tolliver was treated poorly compared to direct reports. It was extremely embarrassing to have his lending authority removed, receive unjustified low "service" scores was unjustified, and be assigned the task of calling on delinquent accounts that were not under his direct control or purview.

29. Interestingly, during his employment, Tolliver was the only person of color of anyone in a leadership capacity within the entire company. Not just the only black vice president but the only black manager (there was another black manager employed by Marine Credit Union at the Fond du Lac location, but he was demoted) within the entire

7

company, or less than one percent of the company.

30. At all material times, Tolliver performed his work duties in accordance with the reasonable expectations of Marine Credit.

### COUNT I – DISCRIMINATION ON THE BASIS OF RACE

31. Tolliver realleges and incorporate by reference the above paragraphs as if they were set forth herein.

32. The decision to terminate Tolliver was based on his race, in violation of Title VII and 42 U.S.C. §§ 1981.

33. Marine Credit's conduct violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a) and 42 U.S.C. § 1981.

34. Tolliver has suffered great physical and emotional pain and suffering, lost wages and other employment benefits, attorney's fees and costs, and other damages that he will establish at trial.

### COUNT II – VIOLATION OF WISCONSIN FAIR EMPLOYMENT LAWS
### (Wis. Stat. §§ 111.31 *et seq.*).

35. Tolliver realleges and incorporate by reference the above paragraphs.

36. Marine Credit, directly, and through its agents, as described above, discriminated against Tolliver because of his race, in violation of Wis. Stat. §§ 111.321, 111.322, and 111.325.

37. Marine Credit, directly, and through its agents, as described above, discriminated against Tolliver because he complained of these discriminatory practices, in violation of Wis. Stat. §111.322 (3).

38. Tolliver has suffered great physical and emotional pain and suffering, lost wages and other employment benefits, attorney's fees and costs, and other damages that

he will establish at trial.

## RELIEF

WHEREFORE, Tolliver respectfully request that this Court:

    a.    Enter judgment against Defendants on the causes of action, as alleged, in this Complaint;

    b.    Order Defendant Marine Credit to reinstate Tolliver;

    c.    Award Tolliver his prospective and retrospective monetary damages;

    d.    Award Tolliver compensatory and punitive damages in an amount to be determined at trial, including damages for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and his other non-pecuniary losses;

    e.    Award Tolliver the cost of this action and reasonable attorneys' fees and costs; and

    f.    Award Tolliver such other and further relief as the Court deems just, necessary and proper.

Dated this 15th day of May, 2019.

**CADE LAW GROUP LLC**

By: s/Nathaniel Cade, Jr.
    Nathaniel Cade, Jr.
    P.O. Box 170887
    Milwaukee, WI 53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com

Attorneys for Plaintiff Darren P. Tolliver

**DEMAND FOR JURY TRIAL**

Tolliver demands a jury trial on all issues of fact.