UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DARREN P. TOLLIVER,

    Plaintiff,

    v.                                                     Case No. 19-CV-727

MARINE CREDIT UNION,

    Defendant.

DECISION AND ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

    Darren P. Tolliver sues his former employer, Marine Credit Union ("MCU") for discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Wisconsin's Fair Employment Act ("WFEA"), Wis. Stat. §§ 111.31 *et seq*. MCU moves for summary judgment dismissing Tolliver's complaint. For the reasons explained below, MCU's motion is granted and this case is dismissed.

## UNDISPUTED FACTS

    MCU is a full-service financial institution that holds a membership of over 60,000 and has locations in Wisconsin, Minnesota, and Iowa. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 24 and Plaintiff's Response to DPFOF ("Pl.'s Resp.") ¶ 1, Docket # 35.) MCU offers automobile, home, and business loans as well as personal loans, refinance options, financial counseling, and programs to repair damaged credit. (*Id.* ¶ 2.) MCU's mission is to assist all members of the community with their financial needs, including high-risk borrowers who may have damaged credit scores. (*Id.* ¶ 3.) During the relevant time period, MCU's more than thirty branch locations were grouped into seven

districts, each of which was overseen and managed by a District Manager, and further subdivided into regions. (*Id.* ¶ 4.)

Tolliver, who is African American, was employed by MCU as the District Manager of its Milwaukee District from March 22, 2016 until his termination on November 10, 2017. (*Id.* ¶¶ 5, 19.) Milwaukee District 2 encompassed two branches at the commencement of Tolliver's employment but grew to three branches during his tenure as District Manager. (*Id.* ¶ 20.) At the time of his hire, despite having previous employment experience at banks, Tolliver had no previous experience with lending approval authority. (*Id.* ¶ 23.) From Tolliver's time of hire until February 2017, Tolliver's direct supervisor was Tim Cruciani, the Executive Vice President for MCU. (*Id.* ¶¶ 6–7.)

MCU maintained a Performance Appraisals, Scorecards, and Monthly Performance Reviews Policy, which explained the various performance evaluation mechanisms set up by MCU to keep employees apprised of their job performance and goals, as well as indicated that if an employee was struggling to meet his or her goals, he or she should seek further guidance and training from his or her supervisor or manager. (*Id.* ¶ 16.) In accordance with MCU's Performance Appraisals, Scorecards, and Monthly Performance Reviews Policy, Tolliver began receiving Monthly Performance Reviews ("MPR") in July 2016, continuing through September 2017. (*Id.* ¶ 27.) For purposes of the MPR Scorecard, 2.0 was the threshold or minimum GPA score certain employees, including District Managers, were required to achieve in order to be considered to be performing satisfactorily or successfully. (*Id.* ¶ 31.) Tolliver received less than a 2.0 GPA on his Scorecard on every MPR under Cruciani's supervision from August 2016 through January 2017, except for November 2016, on which he received a 2.0 GPA. (*Id.* ¶ 32.) In Tolliver's MPRs from August 2016 through

2

January 2017, as well as through day-to-day correspondence with Tolliver, Cruciani consistently identified or raised concerns over Tolliver's problematic lending practices and ability to determine what makes a good loan; unsatisfactory leader/lender success, delinquency, exception, and other statistics; struggle with managing an effective team and communicating performance issues or challenges with his branches; failure to effectively manage his time and responsibilities; and failure to meet scheduled deadlines for himself and his team. (*Id.* ¶ 33.) Within these same documents, Tolliver consistently acknowledged and agreed with the areas of improvement Cruciani had identified; admitted to failures in his job performance; acknowledged the tools and training MCU had provided him to help him improve and succeed; committed to improvement; and expressed interest and enthusiasm over additional career development and growth with MCU. (*Id.* ¶ 34.)

On January 10, 2017, Cruciani issued Tolliver his Annual Performance Review. (*Id.* ¶ 35.) Tolliver received an Annual Performance Review Scorecard GPA of 1.74, which was below the 2.0 threshold he was required to meet, and his overall appraisal rating was "NI" or "Needs Improvement." (*Id.* ¶ 36.)

From February 2017 until Tolliver's termination, Tolliver's direct supervisor was Mark Barker, Senior Vice President and Regional Manager for MCU. (*Id.* ¶¶ 8–9.) On March 29, 2017, Barker issued Tolliver an Employee Written Warning and Resolution Form for "Accountability." (*Id.* ¶ 38.) The written warning addressed several issues: (1) failure to complete required compliance training by the due date; (2) failure to timely deliver an MPR for a direct report and failing to hold that employee accountable for a performance issue; and (3) failing to timely submit his MPRs, which included late submission of his employee portion of his February 2017 MPR, as well as, since November 2016, six

occurrences by Tolliver of not completing the MPRs for his team by the deadline and eight occurrences by his team of not completing their MPRs by the deadline. (Declaration of Becky Potts ("Potts Decl.") ¶ 24, Ex. D, Docket # 26-1 at 17.) In the section marked "Employee Comments: (optional)," Tolliver wrote: "I apologize for my part in the issues documented above. I have put new processes in place to prevent these type of situations from arising in the future. I hope I will be given a fair assessment of my renewed efforts going forward as I want to succeed in my current role." (*Id.* at 18.)

Under Barker's supervision, from March 2017 through September 2017, Tolliver's MPRs, as well as day-to-day correspondence with Barker, continued to identify the same performance issues and failings that had been repeatedly addressed with Tolliver under Cruciani's supervision. (DPFOF ¶ 41 and Pl.'s Resp. ¶ 41.) Barker consistently raised concerns over Tolliver's problematic lending practices and ability to determine what makes a good loan; unsatisfactory leader/lender success, delinquency, exception, and other statistics; struggle with managing an effective team and communicating performance issues or challenges with his branches; failure to effectively manage his time and responsibilities; and failure to meet scheduled deadlines for himself and his team. (*Id.* ¶ 42.) Furthermore, Tolliver consistently acknowledged and agreed with the areas of improvement Barker had identified; admitted to failures in his job performance; acknowledged the tools and training MCU had provided him to help him improve and succeed; committed to improvement; and expressed interest and enthusiasm over additional career development and growth with MCU. (*Id.* ¶ 43.)

Tolliver testified that he would not have scored himself as "needs improvement" on his MPRs, specifically referring to the one dated September 2016, if he felt he was

performing satisfactorily. (Declaration of Suzanne M. Watson ¶ 2, Ex. A, Deposition of Darren Tolliver ("Tolliver Dep.") at 103, Docket # 25-1.) He further testified that he did not believe that anything Cruciani wrote in his MPRs from August 2016 through January 2017 (or the scores he was issued therein) or in his Annual Performance Review in January 2017, or that anything Barker wrote in his MPRs from April 2017 through September 2017, was discriminatory based on his race. (DPFOF ¶ 45 and Pl.'s Resp. ¶ 45; Tolliver Dep. at 104, 107, 109, 112–13, 129–33.)

Troy Moen, MCU's Vice President of Operations, reviewed and audited lender/loan officer decisions and loan quality issues, including through sample reviews of all branches on a monthly basis and specific reviews upon request of management. (Declaration of Troy Moen ("Moen Decl.") ¶ 4, Docket # 30.) Moen avers that he had several conversations with Tolliver during the course of his employment with MCU to explain and teach him proper lending authority parameters, missing information that was critical to the determination of an individual's credit, and where Tolliver and his team were having issues in their lending practices. (*Id.* ¶ 8.) Moen contends that despite this training, Tolliver did not appear to understand the proper lending authority parameters like his fellow District Managers did and thus could not properly train his team on the same. (*Id.* ¶ 9.)

Beginning in or around March 2017, after Tolliver continued to show poor decision making in his lending practices, including through his high delinquency numbers and quality scores being below MCU averages, Moen was asked to conduct reviews of Tolliver's loan decisions. (DPFOF ¶ 52 and Pl.'s Resp. ¶ 52.) Moen avers that he reviewed a sample of approximately ten to twelve loans that Tolliver had recently approved across a spectrum of different product types and based on his findings, Barker temporarily suspended Tolliver's

lending authority. (Moen Decl. ¶ 11.) Tolliver's consumer lending authority was ultimately restored in June 2017 after making improvements; however, his mortgage lending authority was never restored prior to his termination. (DPFOF ¶ 56 and Pl.'s Resp. ¶ 56.)

In November 2017, Tolliver approved two automobile loans that MCU contends were in direct violations of MCU's basic lending policies and practices. (*Id.* ¶ 57.) The first loan was for $49,000 on a 2007 Bentley for an MCU member who had over $700,000 in delinquent commercial loans with MCU. (*Id.* ¶ 58.) This loan had previously been rejected by another district due to the character of the member, who had been difficult to work with, refused to provide necessary documentation, and made consistently late payments on his $700,000+ commercial loan; and the capacity of the applicant, based on his high debt-to-income ratio of 151%, which is well above the 50% mark for a risky loan. (*Id.* ¶ 59.) The second loan was for a 2007 Mercedes, for which Tolliver had to make a term exception in order to approve it, despite having recently been reminded not to make term exceptions for vehicles over ten years old. (*Id.* ¶ 61.) This loan had previously been rejected by another district and MCU contends that Tolliver failed to reach out to that district to inquire as to why it was not approved. (*Id.* ¶ 62.) MCU terminated Tolliver's employment on November 10, 2017. (*Id.* ¶ 64.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere

existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Tolliver asserts that he was unlawfully terminated by MCU on the basis of his race, in violation of Title VII, § 1981, and the WFEA. Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 "protects the right of all persons 'to make and enforce contracts' regardless of race." *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (quoting 42 U.S.C. § 1981(a)). Generally, the requirements to

prove discrimination under § 1981 and Title VII are the same. *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007). While Tolliver also brings a claim pursuant to the WFEA, the Wisconsin Equal Rights Division is the exclusive forum in which an individual can bring a WFEA claim—the WFEA does not create a private right of action. *Staats v. Cnty. of Sawyer*, 220 F.3d 511, 516 (7th Cir. 2000). As such, to the extent Tolliver sues under the WFEA, this claim is dismissed. *See also Sharp v. Stoughton Trailers*, LLC, No. 15-CV-598-JDP, 2016 WL 3102241, at *2 (W.D. Wis. June 2, 2016) ("Although a private right of action under the WFEA existed in that limited window between 2009 and 2012, the window has since closed.").

To defeat summary judgment on his discrimination claim, Tolliver needs to submit evidence from which a reasonable juror could conclude that MCU fired him because of his race. *Ortiz v. Werner Enter. Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). The evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* While *Ortiz* disposes of the distinction between "direct" and "indirect" evidence, it does not affect the *McDonnell Douglas* burden shifting framework. *Id.* at 766; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell Douglas*, Tolliver has the initial burden of establishing that (1) he is a member of a protected class, (2) he performed reasonably on the job in accord with his employer's legitimate expectations, (3) despite his reasonable performance, he was subjected to an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably by the employer. *David v. Bd. of Trustees of Cmty.*

8

*Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If Tolliver satisfies that burden, then MCU must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Tolliver to submit evidence that the MCU's explanation is pretextual. *Id.*

As an initial matter, Tolliver appears to erroneously proceed under the pre-*Ortiz* standard of a "direct" method of proof. (*See* Pl.'s Br. at 4, Docket # 34.) Under this standard, discrimination could be shown either by direct evidence (i.e., an admission of discrimination) or by circumstantial evidence (i.e., a "convincing mosaic" to allow a jury to infer intentional discrimination by the decision-maker.) *See Mason v. Bd. of Trustees of Univ. of Illinois*, 830 F. Supp. 2d 532, 541–42 (C.D. Ill. 2011). Tolliver cites to seven pieces of evidence that he claims create this "convincing mosaic"—(1) he was the sole District Manager required to spend one week in La Crosse, Wisconsin assisting with collections and calling on delinquent accounts; (2) he had to perform both the District Manager and Branch Manager positions without additional compensation and without a plan to fill the vacancy; (3) he received poor quality and service scores on his MPRs; (4) he received a Written Warning; (5) he was not provided a "private" office space; (6) he had his lending authority suspended; and (7) he was terminated. (Pl.'s Br. at 5.) He argues that while none of these pieces of evidence, standing alone, "might necessarily establish race discrimination," that "when the different pieces of evidence are combined, a mosaic . . . is created." (Pl.'s Br. at 4.)

But again, *Ortiz* jettisoned the distinction between "direct" and "indirect" evidence, specifically stating that a "convincing mosaic" is not a legal test. *Ortiz*, 834 F.3d at 765 ("From now on, any decision of a district court that treats this phrase as a legal requirement

in an employment-discrimination case is subject to summary reversal, so that the district court can evaluate the evidence under the correct standard."). Rather, the court stated that "[e]vidence is evidence" and relevant evidence "must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* As articulated above, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Id.*

MCU argues that Tolliver cannot show elements two and four of his *prima facie* case for race discrimination—that he performed reasonably on the job in accordance with MCU's legitimate expectations and that similarly situated employees outside of his protected class were treated more favorably by MCU.

When considering whether an employee is meeting an employer's legitimate expectations, the court looks to whether he was performing adequately at the time of the adverse employment action. *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). "An employee who violates her employer's established policies fails to perform adequately or meet her employer's legitimate expectations." *E.E.O.C. v. Aurora Health Care Inc.*, 933 F. Supp. 2d 1079, 1104 (E.D. Wis. 2013) (citing *Anders v. Waste Mgmt. of Wis., Inc.*, 463 F.3d 670, 676 (7th Cir. 2006)).

In this case, MCU consistently documented Tolliver's performance in monthly performance reviews from July 2016 through September 2017. (Potts Decl. ¶ 24, Ex. D; Tolliver Dep. at 96–133.) Tolliver does not dispute that for purposes of the MPR Scorecard, 2.0 was the minimum GPA employees, including District Managers, were required to achieve to be considered to be performing satisfactorily (DPFOF ¶ 31 and Pl.'s Resp. ¶ 31)

and that he frequently failed to meet this requirement (*id.* ¶ 32). Nor does Tolliver dispute that beginning in January 2017, he began experiencing difficulties with his and his team's performance. Tolliver testified that he did not believe that anything MCU wrote or how he was scored on his performance reviews from August 2016 through January 2017 was discriminatory based on his race. (Tolliver Dep. at 104, 107, 109.)

On the January 10, 2017 MPR, Tolliver received a scorecard GPA of 1.74, below the 2.0 minimum. (*Id.* at 5.) In this review, Tolliver stated that he "did not achieve the results that myself and my team are capable of this past six months." (*Id.* at 9.) Cruciani responded by stating: "Thank you for owning that the results are not what you expect and that you and your team can do better." (*Id.*) In February 2017, Tolliver noted on his MPR that although his team had some successes, "[i]t was not a month I am proud of as a leader" as only three of his fourteen employees achieved a 2.0 or higher and he himself only earned a 1.0 GPA. (Docket # 26-1 at 15.)

In April 2017, Tolliver noted that he felt "today my district is a [Not Satisfactory] in Quality and that is unacceptable." (Docket # 26-1 at 24.) However, both Tolliver and MCU acknowledged improvement in Tolliver, stating that "Darren took to heart the guidance he was provided to work on himself, and then his team's overall commitment to quality in the month of April" (*id.* at 22) and that management was "encouraged by [Tolliver's] continued progress to meet the defined expectations" (*id.* at 25). Tolliver testified that nothing written by MCU in the April 2017 MPR was discriminatory due to race. (Tolliver Dep. at 128.) Over the next several months from May 2017 until September 2017, Tolliver's MPRs continued to document performance deficiencies with Tolliver and his team. (Docket # 26-1

at 26–45.) Despite these documented deficiencies, Tolliver testified that none of these performance reviews were discriminatory based on race. (Tolliver Dep. at 129–33.)

It is only the written warning, dated March 29, 2017, that Tolliver received from Barker that he testified was discriminatory based on his race. (Tolliver Dep. at 120.) On the written warning, Barker noted that Tolliver failed to complete required training by the stated due date; failed to hold one of his direct reports accountable for a member incident; failed to timely submit the employee portion of his February 2017 MPR; and had six occurrences of not completing the MPRs for his direct reports since November 2016. (Docket # 26-1 at 17.) Tolliver wrote on the form that: "I apologize for my part in the issues documented above. I have put new processes in place to prevent these type of situations from arising in the future. I hope I will be given a fair assessment of my renewed efforts going forward as I want to succeed in my current role." (*Id.* at 18.)

Tolliver now testifies that despite what he wrote on the form, he believes the written warning was discriminatory based on his race. He testified: "That's how I feel. I feel I was treated differently here. The word race isn't being used here . . . That's how I feel of other small examples throughout of I see how they're treated." (Tolliver Dep. at 120.) But Tolliver's testimony is nothing more than speculation, and speculation is insufficient to create a triable issue of fact on summary judgment. *See Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017) (stating that "speculation is not enough to create a genuine issue of fact for the purposes of summary judgment").

Finally, the evidence shows that despite Tolliver's documented deficiencies, the final actions that precipitated his termination were two vehicle loans Tolliver approved in November 2017. Barker avers that these two loans were in direct violation of MCU's basic

lending policies and practices. (Declaration of Mark Barker ¶ 20, Docket # 28.) Both loans had been previously rejected by another MCU district. (DPFOF ¶¶ 58–59.) While Tolliver states that he "disputes" that these loans violated MCU's lending policies and practices, he cites to no evidence in support of his assertion. (Pl.'s Resp. to DPFOF ¶¶ 58–59; DPFOF ¶¶ 61–62 and Pl.'s Resp. ¶¶ 61–62.)

Given the record here, no reasonable juror would find that Tolliver was meeting MCU's legitimate expectations. MCU consistently documented Tolliver's deficiencies and not only did Tolliver agree with the vast majority of MCU's assessment, but Tolliver also testified that none of these performance reviews evidenced discrimination based on race. While Tolliver now challenges his March 2017 written warning on the basis of race discrimination, despite having written his agreement with the assessment on the form in a section in which employee comments were optional, he relies on speculation. Furthermore, Tolliver produces no evidence to dispute that the final two loans he made prior to his termination violated MCU's lending policies. For these reasons, summary judgment is warranted on this basis alone.

Even assuming, *arguendo*, Tolliver could show that he was meeting his employer's legitimate expectations, Tolliver has failed to show that similarly situated employees outside of his protected class were treated more favorably by MCU. To qualify as similarly situated, a fellow employee must be "directly comparable to the plaintiff in all material respects." *Walker v. Bd. of Regents of the Univ. of Wis. Sys.*, 410 F.3d 387, 396 (7th Cir. 2005). Specifically, the plaintiff must be "similarly situated with respect to performance, qualifications, and conduct," and must show that the other employee "engaged in similar conduct without differentiating or mitigating circumstances that would distinguish their

conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Tolliver's argument as to this element consists of a single sentence—"Klapperich, Joshua Moore, Jason Kaufman, Ken Brossman, and Terrance/TJ Minnehan also had difficulties with keeping up with their monthly duties." (Pl.'s Br. at 12.) It is only within MCU's proposed findings of fact do I learn that these individuals are all district managers, who are white. (DPFOF ¶ 67 and Pl.'s Resp. ¶ 67.) Tolliver's brief is devoid of any explanation or evidence demonstrating how these individuals were similarly situated, most importantly, showing that these individuals had the same performance issues as Tolliver.

Furthermore, when asked whether Tolliver had any examples of his peers engaging in the same behavior as him without receiving a written warning, Tolliver testified "Not off the top of my head." (Tolliver Dep. at 120.) Tolliver testified that he was not privy to his fellow district manager's MPRs; however, he "felt strongly" that his overall performance "was easily as good or better than theirs." (Tolliver Dep. at 65.) Again, this is not evidence, it is speculation. Tolliver falls woefully short of demonstrating that these alleged comparators are "similarly situated with respect to performance, qualifications, and conduct." *See Radue*, 219 F.3d at 617.

At bottom, the crux of Tolliver's discrimination claim rests on what he perceives is a corporate culture of racism at MCU. (Tolliver Dep. at 134–35.) He testified that "it's impossible for me to know that, because no one of course would ever tell me, hey, Darren, we are intentionally doing this for any reason especially race. But what I'm prepared to contend with my counsel is that institutionalized racism is real, and the effects and the end result of racism, of institutionalized racism is real." (*Id.* at 78–79.) However, general

assertions that a workplace has a discriminatory culture, without specific testimony providing a basis for an inference that discriminatory attitudes permeate a company's employment policies and practices, cannot create a triable issue of fact. *See Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 770 (7th Cir. 2006); *see also Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1270 (10th Cir. 2012) ("Courts are understandably reluctant to allow theories of institutional racism to displace the requirement of personal knowledge of facts concerning adverse employment actions."). Again, while Tolliver asserts that he was treated differently than his white counterparts, beyond this assertion, he points to no specific evidence showing that any similarly situated individuals outside of his protected class were treated more favorably by MCU. For these reasons, summary judgment is granted in favor of MCU.

## CONCLUSION

Tolliver alleges that his former employer, MCU, subjected him to discrimination on the basis of race. The Seventh Circuit has stated, however, that on summary judgment, the "nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts . . . there must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Tolliver has failed to put forth evidence on which a rational trier of fact could find for him on his discrimination claims. Thus, summary judgment is granted in favor of MCU. Tolliver's complaint is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendant's motion for summary judgment (Docket # 23) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant's motion to seal (Docket # 22) is **GRANTED**.

**FINALLY, IT IS ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 6th day of October, 2022.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge